BROWN COUNTY, Appellant, v. ZERR, et al, Respondents

(295 N. W. 289.)

(File No. 8336. Opinion filed December 13, 1940.)

**Chas. E. Gorsuch,** State's Atty., and **Ivan Huntsinger,** Deputy State's Atty., both of Aberdeen, for Plaintiff and Appellant.

**C. S. Acker,** of Aberdeen, for Defendants and Respondents George Zerr and Rose Erwin.

POLLEY, J. In 1937, Brown County, the plaintiff in this action, was engaged in certain WPA projects in the county, and for the purpose of transporting laborers from their homes or other place of assembly to the work on such projects it was necessary to, and the county did, hire and rent various trucks for such purpose. In January, 1937, the county employed the defendant George Zerr to work for the county. He was designated as a "Relief Investigator", but in his testimony he said he was a "sort of handy man for the County Commissioners." While on the stand he testified that he had authority to make purchases up to $25, and to buy oil, gas, tires and batteries. Subject to the approval of the Board of County Commissioners, defendant hired trucks and fixed the compensation for their use, for the transportation of the workers to and from the WPA projects. He testified that it was up to. him to see that the WPA projects were properly operating, and for the services so rendered by him he was to receive, and did receive, a monthly compensation of $100, and had the use of a county car.

On or about the 1st of January, 1938, Zerr had a conversation with the Jones-Lux Motor Company of Hecla, with reference to the renting of a truck for the county. This company had a certain 1935 Chevrolet truck that it was anxious to dispose of. Defendant spoke to Mr. Henley, a member of the board of county commissioners, about the purchase of this truck by the County. To the suggestion made by defendant, Mr. Henley, replied: "We don't want to buy any old trucks, we got plenty of them." Then Henley said: "Why don't you buy it?" "I says, I haven't any money." "He says, why don't you put it to work?" Nothing more relative to the truck was said by either of them and the matter was never mentioned to any other member of the board. This conversation took place while the board of county commissioners was in regular session, but it was a personal conversation between Mr. Zerr and Mr. Henley, and neither of the other members heard the conversation nor knew for more than a year thereafter that said conversation had taken place, except that Mr. Schile, another

member of the board, saw Mr. Henley and Mr. Zerr talking to each other. In regard to this talk Mr. Schile testified as follows:

"Q. Mr. Zerr never told you that he was acquiring this truck by use of county rental funds? A. No, sir."

And on cross-examination he testified as follows:

"Q. And did you hear any of this conversation between Mr. Zerr and Mr. Henley at that time A. Well, I have heard him talk about trucks, but I didn't get the full details as they testified this morning.

"Q. What did you hear? A. I have heard him talk about the truck, whether they wouldn't want to buy the truck, and Mr. Henley, I heard him say 'we are not interested'.

"Q. Did you hear any more? A. That is all.

"Q. You were busy at that time with some other matters, were you? A. Yes.

"Q. Did you have any talk with Mr. Zerr or Mr. Henley shortly after that with reference to this conversation which Mr. Henley and Mr. Zerr had had? A. Well, it was either a day or two after that, Mr. Henley— we were talking about this truck deal and Mr. Henley told me that Mr. Zerr asked him about buying the truck and he told him that he wasn't in favor of it. I says, 'well I wouldn't be in favor, either, to buy any more secondhand trucks'.

"Q. You mean the County or Mr. Zerr? A. The County.

"Q. What further conversation, if any, did you have with Mr. Henley at that time or any other time? A. That was about the only conversation we had; that we didn't know at the time how long we would need this truck up there and that I was not in favor of buying any more secondhand trucks.

"Q. Did Mr. Henley state to you in that conversation that he had told George Zerr he could go ahead and buy it if he wanted to? A. He was talking some about that, but I paid no attention to it.

"Q. But there was something said about that? A. There was something what he mentioned in there to him at one time."

Immediately after said conversation took place the defendant Zerr entered into a secret agreement with the Jones-Lux Motor Company, wherein they agreed to sell him the said truck for approximately $600. Their agreement was that defendant would see to it that the County rented the truck to haul WPA laborers from Hecla, South Dakota, to what was known as the Frederick dam, and for other trips. All bills were submitted to the County in the name of the Jones-Lux Motor Company, and when the County paid them, the money received was applied, first, to the operating costs of the truck and the balance on the contract price of the truck. Brown County needed the truck and it was rented on the assumption that it was at all times the property of the Jones-Lux Motor Company.

In less than seven months from the making of said contract Brown County paid the Jones-Lux Motor Company $750.42, which after deducting operating costs left a balance due on the purchase price of the truck of $78.81 on July 15, 1938. This amount was soon paid and the Motor Company transferred the title to the truck, not to Zerr himself, however, but to the defendant Rose Erwin, his daughter. She then mortgaged the truck to the Western Finance Company to secure a loan of $228. In doing this she was acting as trustee for Zerr, and never claimed to own any interest in the truck herself.

In the month of March, 1939, the members of the Board of County Commissioners, by some means not disclosed by the evidence, learned that defendant had purchased the truck and paid for it by having the amounts due from the County for the use of the truck credited on the purchase price of the truck. Defendant was at once called before the Board of County Commissioners where, upon a disclosure of the actual facts, defendant was discharged from further service for the County. The County then claimed that the truck, having been purchased with funds advanced by the County, belonged to the County. The evidence also showed that the truck had earned considerable sums of money after the purchase price to the Jones-Lux Motor Company had been fully paid. The County claiming that these sums, as

well as the truck, rightfully belonged to the County, immediately started this action for the recovery of the possession of the truck, and for the earnings thereof above the sums that had been paid by defendant on the purchase price of the truck, and the operating costs thereof.

The case was tried to the court without a jury. Findings of fact, conclusions of law and judgment were for defendants, and plaintiff appeals.

For his defense Zerr claims that because of the conversation he had with Commissioner Henley before he purchased the truck the commissioners were charged with full notice in advance of the intention of the defendant to purchase the truck for his own use and consented that he might purchase the truck for himself in the manner above set out.

■ This position of the defendant is not tenable, for the reason, first, that by such conversation Commissioner Henley did not purport to authorize defendant to purchase the truck in any manner or for any purpose; and second, said Commissioner could not without formal action by the Board, as a board, authorize defendant to take action of any kind.

SDC 12.0612 provides that: "Such board shall hold its sessions with open doors and transact all business in the most public manner * * *. All matters pertaining to the interests of the county shall be heard by the board in session only, * * *." The power of county boards must be exercised by them as boards and not by individuals, and the county is not bound by any action taken by members of the board individually. Rolette State Bank v. Rolette County, 55 N. D. 377, 213 N. W. 848; Id., 56 N. D. 571, 218 N. W. 637; State v. Larson et al., 48 N. D. 1144, 189 N. W. 626; 15 C. J. 460, 20 C.J.S., Counties, § 87; Williams v. Bd. of Commissioners, 28 Mont. 360, 72 P. 755.

■ As to the ownership of the truck and the earnings thereof, after the payment of the purchase price: It has long been the settled law of this and other states that property or profits acquired in the manner that Zerr acquired the truck involved in this case, together with the earnings or profits thereof, belong to the employer. At the trial the

point was stressed by the court that no fraud was practiced by Zerr, and that the use of the truck cost the County no more than it would have cost had Zerr not made the contract to purchase the truck; and the court found: "* * * That the charges made to and paid by the county for the use of the truck were only such charges as would pay for its use, and were necessary, fair, reasonable and proper charges for which the county received full benefit, and that the county was in no way misled, defrauded, over-reached, damaged or taken unfair advantage of." But these facts are not material. The vice of such transactions is that the interests of the agent are adverse to the interests of his principal. Or, in the language of this court, quoting from Humphrey v. Eddy Transp. Co., 107 Mich. 163, 65 N. W. 13, and in Lemon v. Little, 21 S. D. 628, 114 N. W. 1001, 1004: "It is the policy of the law to remove all temptation in an agent to be influenced by his own interest to the detriment of his principal." In this case it was to the interest of the County to rent the truck for as little as it reasonably could. On the other hand, it was to the interest of Zerr to have the County pay a high rent for the truck; for the higher the rent paid by the County, the sooner the truck would be paid for and Zerr would be the owner thereof. It may be that the rental fixed by Zerr and the Jones-Lux Motor Company was fair and just, but still the temptation to favor his own interest was there and it is the elimination of the temptation at which the policy of the law is aimed. Of course, where the agent acts with the knowledge and consent of his principal, the result might be different.

The rule announced by this court in Lemon v. Little, supra, has been approved in Brown v. Draeger, 51 S. D. 190, 212 N. W. 869, and Lucey v. Vilhauer, 64 S. D. 54, 264 N. W. 203. The ownership of the earnings of the truck is provided for by SDC 17.0308. This section reads as follows: "Everything which an employee acquires by virtue of his employment, lawfully or unlawfully, during or after the term of employment belongs to the employer, excepting any compensation due the employee." Where an agent was employed by his principal to purchase land at a fixed price,

bought the land for a lower price, thereby making a substantial profit over and above his commission, this court compelled him to account for and pay to his principal the profit so made. McGinty v. Reynolds, 28 S. D. 248, 133 N. W. 281; Lemon v. Little, supra; Michigan Crown Fender Co. v. Welch, 211 Mich. 148, 178 N. W. 684, and see note, 13 A.L.R. p. 896; 2 C.J. § 356, p. 697, 3 C.J.S., Agency, § 165.

The underlying public policy that governs in this class of cases is admirably summed up by Judge Sanborn in his opinion in Trice v. Comstock, 8 Cir., 121 F. 620, 622, 61 L.R.A. 176, where he says in part:

"For reasons of public policy, founded in a profound knowledge of the human intellect and of the motives that inspire the actions of men, the law peremptorily forbids every one who, in a fiduciary relation, has acquired information concerning or interest in the business or property of his correlate from using that knowledge or interest to prevent the latter from accomplishing the purpose of the relation. If one ignores or violates this prohibition, the law charges the interest or the property which he acquires in this way with a trust for the benefit of the other party to the relation, at the option of the latter, while it denies to the former all commission or compensation for his services. This inexorable principle of the law is not based upon, nor conditioned by, the respective interests or powers of the parties to the relation, the times when that relation commences or terminates, or the injury or damage which the betrayal of the confidence given entails. It rests upon a broader foundation, upon that sagacious public policy which, for the purpose of removing all temptation, removes all possibility that a trustee may derive profit from the subject-matter of his trust, so that one whose confidence has been betrayed may enforce the trust which arises under this rule of law although he has sustained no damage, although the confidential relation has terminated before the trust was betrayed, although he had no legal or equitable interest in the property, and although his correlate who acquired it had no joint interest in or discretionary power over it. The only indispensable elements of a good cause of action to

enforce such a trust are the fiduciary relation and the use by one of the parties to it of the knowledge or the interest he acquired through it to prevent the other from accomplishing the purpose of the relation.

"And, within the prohibition of this rule of law, every relation in which the duty of fidelity to each other is imposed upon the parties by the established rules of law is a relation of trust and confidence. The relation of trustee and cestui que trust, principal and agent, client and attorney, employer and employee, who through the employment gains either an interest in or a knowledge of the property or business of his master, are striking and familiar illustrations of the relation. From the agreement which underlies and conditions these fiduciary relations, the law both implies a contract and imposes a duty that the servant shall be faithful to his master, the attorney to his client, the agent to his principal, the trustee to his cestui que trust, that each shall work and act with an eye single to the interest of his correlate, and that no one of them shall use the interest or knowledge which he acquires through the relation so as to defeat or hinder the other party to it in accomplishing any of the purposes for which it was created." (Citing numerous cases.)

The judgment appealed from is reversed.

SMITH, P.J., concurs in the result.
ROBERTS, WARREN, and RUDOLPH, JJ., concur.